May it please the Court, my name is Martha Geer and I represent the Plaintiff's Appellants in this case. And just to follow up on what was just argued is we have to start with standing. The District Court, by leaving standing as an afterthought in this case, decided the Summary Judgment Motion backwards. So the first question is whether 1. Plaintiff's electronic data, 2. Plaintiff's declarations, and 3. Farmers' admissions sufficiently establish Article III standing at the Summary Judgment stage. And if standing is found, the answer to that question also answers whether issues of fact exist on the merits apart from the statute of limitations issue. If standing does not exist, then we're done. Dismissed without prejudice and the statute of limitations decisions goes by the wayside. Since we don't have a whole lot of time, can I just focus at least my concern? What I see in the record here is that you have gathered data which, if the data itself came in unadulterated, there would probably be no issue. But what I understand is that you have taken data from various sources, combined it with your interpretation from other sources and produced a spreadsheet. But it's not an original business document. It's a combination of a variety of things and therefore doesn't qualify as a business record. Why was the District Court wrong in its interpretation of that particular approach? One, the District Court did not look at the data. Can you back up a little bit? I'm sorry. Just move close to one of those mics, if you will, please. One, the District Court did not actually... That wasn't part of the District Court's ruling. But two... I'm sorry. What wasn't part of the District Court's ruling? That was exactly the District Court's ruling. There was this amalgamation of data and so that... Her ruling was, these are spreadsheets that are created for the purposes of litigation, therefore not admissible. But to answer Your My colleagues have presented as the facts. It's not supported by the, in fact, the record. The Miranda deposition and the Miranda declaration, his declaration in Volume 17, pages 4145-4150, and in his depositions, which is... I'm sorry. That was the depositions, right? 4158-4150, pages 4165-78, and pages 4190 and also page 4263, all explained that they get data in from assigners. They get data in from various government and industry sources. This data is all segregated into separate databases. The assigners' data comes and goes into one database. It is segregated within that database by... Into the separate assigners' database. But the spreadsheets combine all of these from the different databases, right? No, they do not. The spreadsheets, in fact, have the information as is confirmed by the... Well, it is... The data in the assigners' databases is exported into the spreadsheets and so attached to, but not... So each declaration of an assigner has attached to it Exhibit A, which comes from MSP's database for that assigner. That declaration confirms that the data in that spreadsheet reflects the data that was forwarded to MSP as part of the assignment. With respect, counsel, I mean, maybe we're looking at different records here, but I thought the very thing that I mentioned before is exactly what happened here. They... All these independent sources, if they come in independently, that's a different issue. But they were amalgamated in some fashion and interpreted in some way in the spreadsheets. That's what the district court found. And that's what Mr. Miranda explained, right? How he explained the process for which you did that. But that is not what Mr. Miranda testified to, and that's not what is in his deposition. Well, okay, at least I can say I have read the Miranda declaration. So that's what I understood it to say. What they do is that you've got the assigners' data. It is then... It is exported into the spreadsheet for that assigner. And that data, then all of the various headings... The headings, say, have MSP in the headings. The reason the headings have MSP is because you've got, just like they talked about in U-Haul, you query the database. And so you've got to have... You have headings that the data is attached to. I'm sorry, can I pause and ask maybe a related question? So in your opponent's brief, there's footnote 21. It says that they asked in discovery that you produce the underlying data by the assigners and any other documents showing payments by the assigners. They say that you responded by saying you have no responsive documents other than the spreadsheets. Do you contest that? The problem here is... Yes, we do contest it. Okay, did you answer? It's because the spreadsheets are not the business record. Okay, okay, pause, pause. Yes. When they asked for discovery of the underlying data, did you produce it? In the form, we exported it to a spreadsheet. Okay, so the answer is no, because you gave the spreadsheets but not the data that created the spreadsheets. They did not ask for... Well, they did not ask for the electronic data. Well, they say they did. So now you're saying you contest that they asked for that? I don't read them as saying they asked for the electronic data. The electronic data was submitted by agreement of the parties and by order of the court to a third party. They did not produce their electronic data either, and Farmers does have electronic data, presented it to a third party. The third party did the data matching, and with the data matching, that then resulted with a list that ultimately became the enrollees that are the subject of the district court's decision. So they gave us the quotes from the actual discovery request asking for the underlying data, and they say you did not produce it, and instead you said all you have is the spreadsheets. So are you saying that that is false? The way they presented is that the underlying data should be bills, paper bills, Not even. It could just be the actual electronic record of the payment. The only way you can produce the electronic payment of the record is by providing them with a link to a database. Or maybe a CD? No. I mean, you could, but it's got to be, it's electronic. Right. And so if you've got, and that is not, they have not argued that the error in this case was that we did not give them access to our electronic database. The data that came down that was exported into a spreadsheet was exactly what they, it was exactly what the data is in the electronic form. Counsel, because you have so little time left, it sounds like you're arguing against what the record leaks that I read. Let's just, for discussion purposes, let's assume that the district court was correct that the spreadsheets represent an amalgamation of various data sources with your spin in it. Where does that leave us in this case? It is still, we still have laid the record through the Miranda declaration. Okay, say you lose on that part. Where do we go from there? What I'm saying is that there is nothing that precludes a combination of resources and that if you lay the record that they are your business records. And that has been happened. The record has been laid. That is true as a general matter. Right. But it needs to be sort of prepared in the ordinary course of business. And it needs to not be the case that the circumstances suggest a lack of trustworthiness. And here the district court found that it was created for litigation and that it does lack trustworthiness. So why was that an abuse of discretion? The district court judge found that the spreadsheet was created for the purposes of litigation. She did not talk about the data itself because she obviously did not understand that the data is the business record. And the data, if we hold that the collection of the types of data that MSP collected for purposes of their business, then no collection agency is ever going to be able to do business. But I think in response to my questions, you didn't, you said that all you produced was the spreadsheet. So I think you needed to also produce the underlying data if the data is the business record. The farmers understood that there was electronic data because they have electronic data too, which they're using in their own spreadsheets. And they understood that the electronic data was being submitted to a third party for matching. They did not, I don't see any site where they say that they wanted the electronic data. Okay. Well, I think that that's what request 1HI was saying. And it's quoted in their brief. But they don't, you know, when they have, you know, what they have argued and pointed to is that spreadsheets must, I mean, this is their argument and it was the district court's argument, that the problem here was that we had not attached the data files. You cannot attach data files to a document. You can attach, export. But you could produce data files. That's right. But they did not at any time move to compel for the production of the data files. And they knew that there were data files because it's being produced for purposes of the data matching. They know that. So if they had actually... Can I ask a different question? Yes. So I understand that it's your position that farmers didn't need prior notice of the amounts that they were owed. But I'm trying to understand, is your position that this lawsuit is the notice of what you think they owe? Like, is there any other time other than when they received this spreadsheet in this litigation that they got notice of what was owed? They are, it is their job to contact under 411.25, 42 CFR 411.25. They are the primary payer. There's no dispute about them being the primary payer for each of these enrollees. But I thought they just gave the MSP, or sorry, I don't remember the acronym. But they give notice that they are the primary payer. But then someone has to tell them how much Medicare paid so they know how much they owe back. It is their responsibility under 42 U.S.C. 411.25 to go to the secondary payers, to identify the secondary payers and to coordinate benefits. That is their responsibility. They point to another regulation that was... So I thought the idea was they give notice that they're the primary payer and then the secondary payer is supposed to tell them, okay, this is what we paid. No, that is not, there is no regulation that says that. There is a regulation that says that as to, let me get the other regulation that they rely upon, that was adopted the same time that the 422.108B was promulgated at the same time that Part C was enacted. And they say that places a burden on secondary payer to coordinate benefits. What it does is it says as between CMS and the MAO, if there is a coordination of benefits, which under 411.25 must be initiated by the primary payer, then, you know, the MAO must take responsibility for doing whatever coordination needs to be done with the primary payer who must contact them first. Counsel, do you want to save any of your time? It's up to you. Yes, Your Honor, I would. Very well. Let's hear from the other side. Good morning, Your Honors. May it please the Court. I'm Valerie Greenberg. I'm here with my colleague, Michael Weiss, on behalf of the Appalese, the plaintiffs, and the underlying case. The case has failed to produce any evidence to raise an issue of triable fact. And the spreadsheets, no matter how you cut it, are inadmissible. Apart from admissibility, the spreadsheets don't even attempt to address certain critical components of the claims. Separately, the district court's ruling with respect to the statute of entering a summary judgment as opposed to a dismissal without prejudice is correct. Quickly addressing my colleague's initial remarks that this case has something to do with standing, unlike the case that was argued before ours, this did not reach the district court judge on a motion to dismiss. This was a summary judgment proceeding after five years of litigation and full-blown discovery. Simply because the court went through all of the evidence and ultimately held, plaintiffs, you can't prove your case. And by the way, that also meant you couldn't prove what you told me in the beginning, that your assigners had an injury. In fact, well, you didn't prove standing as well. That's not a do-over. And the summary judgment was a proper procedure. This is not a question. of Article III type standing to actually proceed with the litigation. With respect to the issue of the spreadsheets and what they are, Judge Smith's initial recitation, and I think the rest of the court's interpretation, and Judge Friedland having read Mr. Miranda's declaration, this court is correct. These spreadsheets are an amalgamation. I think Judge Smith actually used that word. Mr. Miranda very clearly testified in both his deposition and his declaration that the plaintiffs' purchase and otherwise accumulate information from a variety of third-party sources. They put that all into what they refer to as the MSP system, this black box system. They have developed what they refer to as a funneling algorithm, and they reach in and they pull out a strategic composition of what they want to present in this case. And the only evidence that they presented with respect to the fact of an alleged payment, an alleged bill, alleged injuries for which treatments were rendered, allegedly resulting from car accidents, were these spreadsheets. And the spreadsheets don't meet any of the tests under Rule 8036. Not only are they a combination of a host of sources' information, but whether they contained only the information from the assigners or the information from the assigners plus information from a laundry list of other third-party sources, not a single person testified in this case about Step 1 under Rule 8036A, which is how the original information was created. Just following up on an earlier question by one of my colleagues, she asked your opponent about the response to an inquiry and discovery about the original documentation. Is it correct that when you asked for the original source documentation, you were told that what was there was the spreadsheets and that was it? That is exactly correct. I could take up probably 30 seconds and read the requests for production, but the requests for production that Judge Friedland was referring to request copies of all data without elimination of any data preceding or after the date of loss, without elimination of any fields or types of data, without addition of any data in their original form provided to the plaintiffs, their affiliates, from any assigners. So that would cover the raw data. So there's not a question of electronic versus paper. It didn't matter. You asked for everything. We asked for everything. We asked for all spreadsheets. We asked for what preceded the spreadsheets. And we asked for anything else that the plaintiffs could possibly rely on at any point to prove that there was a bill, that there was a payment. It was not limited to proof of bill. By the way, the Medicare plans are billed. They're billed electronically, but there's actually a billing form. There's not a code that flies around untethered from anything. So we asked for the full panoply, and what we got were spreadsheets, every one of them indisputably produced by the plaintiffs. Every one has the MSP moniker across the top. And again, they are an amalgamation of information from a variety of sources. Mr. Miranda himself not only listed those sources, he also admitted that MSP recovery itself creates an entire column called the paid adjusted column and actually changed some of the data for some of the claimants from zero to certain dollar amounts because the plaintiffs simply wanted to litigate commercial rates and not what was actually billed. So the court is correct. These spreadsheets were made for litigation. They were made by the plaintiffs for the litigation. The district judge very quickly came to that conclusion and deemed them noncompliant with Rule 8036 because A, B, C, and D, there was no proof about the creation by a qualified person that they were made at or about the time of events for which they were being proffered to prove, which is a bill and a payment and that type of thing. Could you just describe how, in your view, this actually works or is supposed to work? Like, Farmers gives notice to CMS that it is the primary and then what is supposed to happen? I very much welcome that question because I would like to clear that up in this record and for all purposes. There is a singular reporting requirement and it's called Section 111. It's under the Medicare and Medicaid SHIP Extension Act. It was enacted in 2007, which, by the way, is after the Baxter case that is cited in the appellant's brief for the notion that Medicare and Medicare plans pay in the dark. And Medicare takes that information and monthly, at minimum, disseminates that to Medicare Advantage plans, such as the plaintiffs' signers. Those Medicare plans then know Farmers has an open claim on the John Smith car accident and we think we're paying bills or about to pay bills. We need to stay in touch with Farmers. The onus is on the Medicare plans to coordinate benefits and that's explicit in the regulations, that Medicare and the MAOs must coordinate benefits. This has also been part of language in certain court opinions, which is briefed in our case. And so, if it's working correctly, what does that look like? Like, what happens then when Blue Cross or whoever the MAO is realizes Farmers has... There's nothing bad about having a secondary payment. It doesn't mean anybody was acting improperly. Very frequently, two insurance companies are disputing who's at fault in a car accident and, you know, you and I hit each other right in the middle of the intersection and my carrier says, no, Judge Friedland's at fault and vice versa and maybe they don't settle for three years. In the meantime, I'm enrolled in Medicare. Medicare's going to start paying my bills, thankfully. Once my carrier settles, they report to Medicare and Medicare can come back and contact my carrier and say, you know what, we paid for these bills and now you need to reimburse us. And most of that is done in the ordinary course using regular collections companies that don't file lawsuits under 1395YB3, the double damages provision. These particular plaintiffs... But it usually is done through a third party, not through, like, someone at Blue Cross calling? Most of the large Medicare companies hire recovery vendors. Some of them, in fact, own their own recovery vendors. There are third parties. Rawlings is a very large recovery vendor. Their name comes up in some of the assignments in these cases. UnitedHealthcare owns its own optum. But it's regular debt collection. And this case ultimately boils down to regular debt collection. And the plaintiffs needed to prove that their assigners paid bills and these defendants owe them and, you know, reimbursement is necessary. Under the Medicare Secondary Pay Act, if that happens and then payment is not made and there is sort of a derelict failure, which this court's DeVita case addressed, the failure to pay to be cognizable under the double damages provision needs to be actionable under this particular Medicare statute. It's not supposed to be an ordinary billing dispute. So if it's an ordinary billing dispute, it should get resolved. If it escalates to some other level, perhaps a plaintiff can invoke 1395YB3 for double damages. But I think back to Judge Friedland's original correction, there's no proof in this case that these defendants received a single bill that they didn't pay. And in fact, part of the discovery in the case is farmers produced 200 plus claim files. And this court clearly read the record. And there's no one in the record that picks up one of the bills and says, you knew this and you didn't pay it. What we have is the plaintiff saying, here are our homemade made for litigation spreadsheets that are thousands of pages of hieroglyphic codes and numbers. And trust us, in here is something you owe. And you're really bad and now you have to pay us twice that amount. And Judge Snyder, our district judge, cut through a lot of the arguments and in a very, very detailed and thorough opinion, which she shared with this court, all of the arguments the defendants made. She ultimately ruled that the plaintiffs got to what the Seventh Circuit has called the put up or shut up moment in these cases empty handed. I think the court has appreciated the argument. If there's anything else I can answer, I'd be more than happy to. Otherwise, I would very much like to thank the court for taking the time and clearly such an interest in reading our record and having the conversation with us. And I would request that this court do exactly what the Seventh Circuit did in one of these plaintiff's cases where that court found, and I quote the Seventh Circuit, enough is enough. And would ask this court to affirm the district court's opinion in all respects. Thank you very much. Very well. Thank you very much. All right. Ms. Geary, you have a little bit of rebuttal time. First, the easy question is standing applies at the summary judgment stage. Lujan says it itself. Transamerica was decided after trial. So there's no question that if the court deems there to be a lack of Article III standing because that's quite right. I mean, standing does apply at summary judgment, but it's not the case. Is it that anytime a plaintiff fails to establish, I mean, injury is an element of a lot of sort of ordinary torts, right? And if somebody brings a sort of traditional common law negligence action, right, and says, you know, you damaged my property, and then they get to summary judgment and they don't actually have evidence that their property was damaged, the district court doesn't dismiss that for lack of standing, does it? It says, like, you haven't established liability. That's a judgment on the merits, right? That's where it gets mingled, but here what happened is a different procedural posture. It's defendants that argued Article III standing and that the case should be, you know, should be decided on that basis, and the district court judge found that there's no Article III standing, so there's no jurisdiction. There would have to be a determination by this court that there is standing at this stage. If there is standing, then much of what was just argued doesn't, you know, it runs smack dab into that, and I would like to just address briefly also the merits, which is we didn't hear any mention of 411.25, that reg from farmers. Not a word, and that is the key. That reg says that the burden is on the primary payer to coordinate. There is no citation. There is no case that holds that all they have to do is Section 111 reporting and that's it. 411.25 says otherwise. DeVita basically says otherwise. The 7th Circuit case they cited, the 7th Circuit's case does not support this. The 11th Circuit does not support this. They have no authority that supports their position. All right. Counsel, we thank you very much for your argument. Thanks to both counsel. The case just argued is submitted, and the court stands adjourned for the day.
judges: SMITH, FRIEDLAND, MILLER